# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

SHIJUN LIU, INDIVIDUALLY AND AS TRUSTEE OF THE LIU FAMILY TRUST 2019,
Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

PALANTIR TECHNOLOGIES INC.,
ALEXANDER KARP,
STEPHEN COHEN,
PETER THIEL,
WILLIAM HO,
KEVIN KAWASAKI,
DAVID GLAZER,
SHYAM SANKAR,
ALEXANDER MOORE,
SPENCER RASCOFF, and
ALEXANDRA SCHIFF,

      Defendants.          <u>DEMAND FOR JURY TRIAL</u>

---

## PLAINTIFF'S CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

Plaintiff Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019 ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of the U.S. Securities and Exchange Commission ("SEC") filings by defendant Palantir Technologies Inc. ("Palantir" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.    This is a securities class action on behalf of all purchasers of Palantir Class A common stock during the period September 30, 2020 to August 5, 2022 (the "Class Period"), including purchases pursuant and/or traceable to the Registration Statement and Prospectus (as defined herein) used in connection with the offer, sale, and direct listing of Palantir Class A common stock on the New York Stock Exchange ("NYSE") beginning on or about September 30, 2020 (the "Offering").

## JURISDICTION AND VENUE

2.    Jurisdiction is conferred by 28 U.S.C. §1331, §22 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77v, and §27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa. The claims alleged herein arise under §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, and §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.    Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b) because Palantir is headquartered in this District, and the statements by defendants alleged herein to be materially false and misleading and which are the subject of this action were disseminated from this District and were received by Palantir shareholders in this District.

4.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.    Plaintiff Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019, as set forth in the attached Certification incorporated herein by reference, purchased Palantir Class A common stock during the Class Period, including shares pursuant and/or traceable to the Registration Statement and Prospectus used in connection with the Offering, and was damaged thereby.

6.    Defendant Palantir is a software and data analytics company.  Beginning in September 2020 the Company conducted the Offering via which Palantir Class A shares became publicly listed on the NYSE under the ticker symbol "PLTR."  Palantir employs a multi-class share structure designed to concentrate power in the hands of Palantir insiders.  Most significantly, the Company issued highly unusual Class F common stock to its co-founders, defendants Alexander Karp, Stephen Cohen, and Peter Thiel, that, through its variable nature, essentially ensures that these defendants will retain voting control over the Company out of proportion with their economic

- 2 -

stake.  The Class F stock effectively allows these defendants to assert control over Palantir even if they reduce their holdings of regular Palantir shares.

7.      Defendant Alexander Karp ("Karp") co-founded Palantir and served as its Chief Executive Officer ("CEO") and a member of Palantir's Board of Directors (the "Board") during the Class Period.  Defendant Karp registered over 20.5 million Palantir shares for resale to the public via the Offering.

8.      Defendant Stephen Cohen ("Cohen") co-founded Palantir and served as its President, Secretary, and a member of the Board during the Class Period.  Defendant Cohen registered over 6.4 million Palantir shares for resale to the public via the Offering.

9.      Defendant Peter Thiel ("Thiel") co-founded Palantir and served as Chairman of the Board during the Class Period.  Defendant Thiel registered over 62 million Palantir shares for resale to the public via the Offering.

10.      Defendant William Ho ("Ho") served as Corporate Controller and the Principal Accounting Officer and Head of Global Revenue of Palantir from the start of the Class Period until October 2020, after which he served as Palantir's Head of Global Revenue.

11.      Defendant Kevin Kawasaki ("Kawasaki") served as Palantir's Head of Business Development during the Class Period.

12.      Defendant David Glazer ("Glazer") served as Chief Financial Officer ("CFO") and Treasurer of Palantir during the Class Period.

13.      Defendant Shyam Sankar ("Sankar") served as Chief Operating Officer ("COO") and Executive Vice President of Palantir during the Class Period.  Defendant Sankar registered over 3.2 million Palantir shares for resale to the public via the Offering.

14.    Defendant Alexander Moore ("Moore") served as a member of the Board during the Class Period and was previously an employee of the Company.  Defendant Moore registered over 500,000 Palantir shares for resale to the public via the Offering.

15.    Defendant Spencer Rascoff ("Rascoff") served as a member of the Board during the Class Period until June 2002.  Defendant Rascoff registered over 43,000 Palantir shares for resale to the public via the Offering.

16.    Defendant Alexandra Schiff ("Schiff") served as a member of the Board during the Class Period.  Defendant Schiff registered over 2,000 Palantir shares for resale to the public via the Offering.

17.    The defendants identified in ¶¶7-16 above are referred to herein as the "Individual Defendants."  The Individual Defendants were key members of the Offering working group and executives and directors of Palantir who pitched investors to purchase the shares sold in the Offering.  The Individual Defendants solicited plaintiff and the Class to purchase the shares sold in the Offering, including by engaging in a September 9, 2020 conference call with analysts and investors led by defendants Karp, Sankar, Kawasaki, and Glazer.  Each of the Individual Defendants, other than defendants Sankar and Kawasaki, signed the Registration Statement, and as directors and/or executive officers of the Company participated in the solicitation and sale of Palantir Class A common stock to investors in the Offering for their own financial benefit and the financial benefit of Palantir.

## CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Palantir Class A common stock during the Class Period (the "Class").

Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's Form 10-K for the fiscal year ended December 31, 2021, Palantir had more than 1.9 billion shares of Class A common stock outstanding as of February 17, 2022.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Palantir or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the Securities Act and/or the Exchange Act;

(b)     whether defendants made inaccurate statements of material fact and omitted

material information required to be stated therein during the Class Period; and

(c)     to what extent the members of the Class have sustained damages and the

proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

24.     In 2003, defendants Thiel, Karp, and Cohen co-founded Palantir in Palo Alto,

California.   Palantir began as a software development firm serving the U.S. intelligence

community in counterterrorism investigations and operations.  The Company's initial software

platform, named Gotham, is used to find patterns and organize data in large and complex data sets.

Palantir uses the Gotham platform to design tailor-made software for its clients, which have

historically consisted of government agencies.

25.     In 2016, Palantir launched a new product, named Foundry, to attract more

commercial clients.  Foundry is designed to link disparate and largely incompatible data sources

into a central operating system.  Although Foundry offers more ready-made software applications,

both products require the designing of specific capabilities to match a particular client's needs and

industry.  Following the launch of Foundry, Palantir successfully grew its commercial client base

and, by 2020, the Company generated about 50% of its revenue from business clients and 50% from public sector clients.

26.     Palantir has a concentrated client base and relies on large contracts to generate revenue.  As of early 2020, Palantir software was used by only 125 customers.[1]  Approximately 30% of Palantir's revenue was generated by just three customers in the first half of 2020.  The large size and protracted procurement process of Palantir's contracts, and the need for the Company to work closely with its relatively concentrated client base, provide the Company and its management with substantial visibility into future revenue.  An important indicator of the Company's prospects is Palantir's remaining "deal value," which measures the amount of contracted revenue that has not yet been received by the Company and thus purportedly provides management and investors significant visibility into future expected revenue.  According to Palantir CFO defendant Glazer, the Company has "strong visibility into future revenues across [its] customer base."

27.     In the years since its founding, Palantir has claimed to have experienced considerable growth.  By 2019, Palantir claimed to have over $742 million in annual revenue, a 25% increase over the prior year.  Despite this revenue growth, Palantir was not profitable, posting a $580 million net loss for the year.  Nevertheless, Palantir reassured investors that it was improving its gross profits and contribution margins as it moved closer to profitability, generating

---

[1]     Palantir considers different agencies of the same government to be separate "customers."

$500 million in 2019 gross profit at a 21% contribution margin, compared to $430 million in gross profit at a 14% contribution margin the prior year.[2]

28.     By 2020, Palantir had grown into one of the most valuable private startups in the world.  At a reported $20 billion valuation, at the time Palantir was estimated to be the third most valuable private startup in the United States.  Despite years of resisting a public offering, in July 2020 Palantir announced that it had made a confidential submission of a draft registration statement with the SEC for a public offering via a direct listing.  Unlike a traditional initial public offering, in which a company raises capital through an underwriting syndicate at a set price, in a direct listing shares are sold at whatever price the market bears without being underwritten.  Palantir's Offering – like most direct listings – did not raise any capital for the Company but rather consisted entirely of share sales by Palantir insiders, most notably several of the Individual Defendants.  In order to secure a high valuation in connection with the Offering, Palantir needed to demonstrate to investors that the Company was poised to eventually turn a profit by sustaining its recent revenue growth and improving its operating efficiencies.  As reported in *The Wall Street Journal*, "[w]ith Palantir, the potentially higher valuation in an IPO reflects in part the firm's improving business prospects."

29.     Several weeks after beginning the public listing process, on August 19, 2020, news agencies reported that Palantir had decided to move its headquarters from Palo Alto, California to Denver, Colorado.  On August 25, 2020, Palantir filed with the SEC a registration statement for

---

[2]     Palantir defines contribution margin as revenue less cost of revenue and sales and marketing expenses, excluding stock-based compensation, divided by revenue.

the Offering on Form S-1, which was followed by several amendments, the last of which was filed with the SEC on September 21, 2020 (the "Registration Statement").

30.    On September 9, 2020, several of the Individual Defendants participated in an "Investor Day" intended to solicit investments in the Offering, including defendants Karp, Sankar, Kawasaki, and Glazer.  During his prepared remarks, defendant Karp stated:

> [W]hat's interesting about what we're showing you today is that you're going to get to take a look at our financial history and one of the things that I think people have already noticed is that the revenue has grown dramatically, that the quality of the revenue is in my view astonishing and then the combination of quality of revenue and growth it's a very unique company.

Defendant Karp posed a question to himself regarding the Company's recent dramatic revenue growth, asking: "[H]ow did you get this revenue growth off a large scale late into the history of a tech company?"  Defendant Karp then answered his own question, stating that Palantir was "just different" and owed its recent growth to its provision of superior products and services that its customers needed.

31.    The Registration Statement became effective on September 22, 2020.   On September 30, 2020, the Company filed with the SEC a final prospectus on Form 424B4, which was updated via a prospectus supplement filed with the SEC on November 13, 2020 (the "Prospectus") and which incorporated and formed part of the Registration Statement.  Pursuant to the Registration Statement, the Company registered for resale over 257 million shares of its Class A common stock held by Company insiders, including several of the Individual Defendants as specified herein.  None of the proceeds from the Offering went to Palantir.

32.    Unbeknownst to investors, at the time of the Offering Palantir's robust growth in government revenue and deal value had been temporarily inflated by short-term contracts that the

Company had entered into in connection with government responses to the COVID-19 pandemic. Palantir's 2020 and early 2021 results reflected a temporary boost to the Company's government business that was internally expected to significantly moderate and potentially even decline by the end of 2021 as governments wound down their pandemic responses. Rather than disclose these adverse facts, during the Class Period defendants claimed that Palantir's government revenue growth was not only sustainable but accelerating as Palantir purportedly expanded its government client base and scaled its business with existing clients.

33. Following the Offering, to create the appearance of continued robust client and revenue growth in the face of waning government support, Palantir launched a highly unorthodox investment program in which the Company invested in early-stage companies in exchange for these companies agreeing to enter into contracts for Palantir's products and services (the "SPAC Investment Strategy"). The majority of these companies were acquired, or looking to be acquired, by special purpose acquisition companies ("SPACs"). SPACs, also known as blank check companies, raise cash in an initial public offering, the proceeds of which are used to acquire a private company and bring that company public. By the end of 2021, Palantir had invested over $320 million in various early-stage companies through its SPAC Investment Strategy. In return the Company claimed to have procured nearly $770 million in the "total value" of commercial contracts with these companies, which represented a substantial portion of the Company's claimed $2.6 billion in total remaining deal value with its commercial clients.

34. Then, beginning in November 2021, through a series of partial disclosures Palantir revealed an abrupt slowdown in both its government and commercial operating segments. Rather than experiencing accelerating growth, Palantir has ultimately revealed sequential ***declines*** in its

government revenue, government deal value, and total deal value. Similarly, Palantir's commercial business has stalled, and the Company was forced to abandon its SPAC Investment Strategy and effectively pull its five-year revenue guidance just a year-and-a-half after first announcing it. Virtually **all** of the more than two dozen companies that Palantir partnered with through its SPAC Investment Strategy have floundered, with the majority teetering on the edge of bankruptcy and suffering tremendous losses, casting substantial doubt on their ability to pay Palantir contracted revenue, and causing Palantir to suffer tens of millions of dollars in investment losses.

35.     As a result, the price of Palantir stock collapsed ***more than 80%*** below the Class Period high to less than $8 per share, causing investors to suffer significant losses and economic damages under the federal securities laws. But not before the Individual Defendants sold over $2 billion worth of their own Palantir shares, many of which had been registered for resale via the Offering, at prices as high as $33.89 per share.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

36.     The Class Period begins on September 30, 2020. On that date, Palantir filed with the SEC the final Prospectus, which incorporated and formed part of the Registration Statement. The Registration Statement claimed that Palantir was experiencing accelerating growth at the time of the Offering, stating: "Our growth this year has accelerated." The Registration Statement continued in pertinent part as follows:[3]

---

[3]     Emphasis added unless otherwise noted.

We generated $742.6 million in revenue in 2019, reflecting an increase of 25% from our revenue in 2018, which was $595.4 million.

*In the first half of this year alone, during a period of significant geopolitical instability and economic contraction, we generated $481.2 million in revenue, reflecting a growth rate of 49% over the same period last year*.

37. The Registration Statement contained the following graph which illustrated Palantir's purportedly accelerating revenue growth trend:



38. In particular, the Registration Statement highlighted the recent growth in Palantir's government contracts, stating in pertinent part as follows:

*As of June 30, 2020, the total remaining deal value of the contracts that we had been awarded by government agencies in the United States and allied countries around the world*, including existing contractual obligations and contractual options available to those government agencies, *was $1.2 billion, up 74% from December 31, 2018*, when the total value of such contracts was $670.6 million.

- 12 -

39.     The Registration Statement similarly stated that the "scale of [Palantir's] partnerships with customers, in revenue terms, has also grown over time," claiming that average revenue per customer had increased from $5.2 million in 2018 to $5.6 million by 2019.

40.     The Registration Statement further represented that Palantir's operating results were improving, which indicated to investors that the Company was on the path to eventual profitability.  For example, the Registration Statement stated in pertinent part as follows:

> ***Our operating results have improved significantly in recent years***.  In 2019, we incurred a net loss of $579.6 million, or a net loss of $337.7 million when excluding stock-based compensation.  In H1 2020, our net loss decreased to $164.7 million, or net income of $17.2 million when excluding stock-based compensation, down from a loss of $280.5 million in H1 2019, or a loss of $167.6 million when excluding stock-based compensation.

41.     Likewise, the Registration Statement stated: "We believe that all of our customers will move into the Scale phase over the long term."  The Registration Statement described the "Scale phase" as consisting of the phase in which, "[a]s customer accounts mature, [Palantir's] investment costs relative to revenue generally decrease, while the value [Palantir] software provides to [its] customer increases, often significantly, as usage of the platform increases across the customer's operations" and, as a result, the "contribution margin on particular accounts improve."  Thus, the Registration Statement represented that, over time, all of Palantir's customers were expected to enter the "Scale phase," which indicated improved profit margins across Palantir's customer base.

42.     The Registration Statement further represented that Palantir would "[c]ontinue expansion into the commercial sector" and was "working towards becoming the default operating system across the U.S. government."  The Registration Statement claimed that Palantir's growth

opportunity was enormous, estimating Palantir's "total addressable market to be approximately $119 billion across the commercial and government sectors."

43.     On November 12, 2020, Palantir issued a press release providing the Company's financial results for the third quarter ended September 30, 2020 (the "3Q20 Release").  The 3Q20 Release stated that Palantir had $289.4 million in revenue for the quarter, up 52% year-over-year, and raised annual 2020 revenue guidance to a range of $1.07 billion to $1.072 billion.  The release stated that "growth and momentum across [Palantir's] business have continued" and that the "demand for [Palantir's] software has increased steadily over the past year in the face of significant economic and geopolitical uncertainty in the United States and abroad."

44.     Also on November 12, 2020, Palantir held an earnings conference call with analysts and investors led by defendants Glazer, Kawasaki, and Sankar to discuss the Company's third quarter 2020 results.  During his prepared remarks, defendant Sankar stated that, for the quarter, "[r]evenue grew 52% year-over-year, driven by continued expansion within our install base and initial wins at net new 2020 customers."  Defendant Sankar further represented that Palantir's "business is just getting started" and that the favorable results were "largely a function of the technology that we've developed over these years."  Defendant Sankar likewise claimed that the recent growth in the Company's business was sustainable, as "the pandemic is leading to lasting and systemic transformation of health care."  Defendant Sankar continued: "It may have started with COVID, but it's not going to end there as the pandemic has revealed a broad swath of challenges and opportunities these institutions are rising to meet . . . and we have the opportunity to be at the center of it."

45. During his prepared remarks, defendant Glazer highlighted the recent growth in government revenue, stating: "Total government revenue rose 68% year-over-year to $163 million, driven primarily by growth in our U.S. government business."  Defendant Glazer further stated: "At the end of the third quarter, our government deal value, including contracted amounts and contractual options, totaled $1.3 billion."  Defendant Glazer represented that revenue from existing customers would continue to grow, stating: "Taken together with continued revenue growth from our acquire phase customers, we believe the rapid growth in revenue from new customers creates a strong basis for future growth to augment the consistent expansion we are generating from our install base of customers in the expand and scale basis."

46. During the question-and-answer portion of the call, defendant Sankar was asked "about the pipeline and the residual kind of carryover from the government business," to which defendant Sankar responded that the opportunities were "enormous" and "very clear[ly]" not going to end following the COVID-19 pandemic, stating in pertinent part as follows:

> Yes, the government business had a great quarter.  I'd say both segments are performing quite well.  We're excited about the pipeline of the government business.  Of course, there's the contract that we just closed with the U.S. Army.  There's a number of big capture pursuits in the pipeline, things that we've mentioned previously, opportunities like DCGS, Capability Drop 2.  There's a lot more behind that, that we expect.  There are a couple of more programs of record that we're up for potentially in 2021.  And we're investing far beyond just the Army, Space Force, the Navy, Air Force, so very robust pipeline, but that's just DoD.  Like honestly, there's been enormous acceleration for a part of a business that was pretty small 18 months ago in health care.  ***The work that we've done with the FDA, CDC, HHS, the NIH has really accelerated.  And it's created enormous opportunities for us***.
>
> ***And while many of those opportunities certainly accelerated because of COVID, it may have started there, it's very clear it's not going to end there.  We're seeing opportunities for large systemic transformation in health care in the U.S. but also abroad, COVID-exposed opportunities for improvement, and I think governments are going to invest there***.

- 15 -

47.     On November 13, 2020, Palantir filed with the SEC a quarterly report on Form 10-

Q which contained the financial information provided in the 3Q20 Release, and which was signed

by defendants Karp and Glazer.  The Form 10-Q stated that Palantir's government deal value had

continued to increase, stating in pertinent part as follows:

> *As of September 30, 2020, the total remaining deal value of the contracts
> that we had been awarded by government agencies in the United States and allied
> countries around the world*, including existing contractual obligations and
> contractual options available to those government agencies, *was $1.3 billion, up
> 14% from December 31, 2019, when the total value of such contracts was $1.1
> billion*.

48.     On February 16, 2021, Palantir issued a press release providing the Company's

financial results for the fourth quarter and full year ended December 31, 2020 (the "FY20

Release").  The FY20 Release stated that Palantir had $322 million in revenue for the fourth

quarter, up 40% year-over-year.  The release set full year 2021 revenue outlook at "greater than

30%" growth and first quarter 2021 outlook at 45% revenue growth.

49.     Also on February 16, 2021, Palantir held an earnings conference call with analysts

and investors led by defendants Karp, Glazer, Kawasaki, and Sankar to discuss the Company's

fourth quarter and full year 2020 results.  During his prepared remarks, defendant Sankar claimed

that, in 2020, "for many of [Palantir's] customers, in a short period, we became their default

operating system.  We became critical to the core functioning of their operations."  Defendant

Sankar further stated that, in "meeting that moment, our business grew significantly in 2020,

resulting in 47% revenue growth on a full year," and that Palantir had "created and continue[s] to

create substantial opportunities for growth over the next year and beyond."

50.     Defendant Sankar went on to emphasize the ostensibly robust growth in Palantir's

government segment, claiming that "91%" year-over-year growth in U.S. government revenue was

"just at the tip of the iceberg." Defendant Sankar stated in pertinent part as follows:

> The full year government revenue rose 77%, led by ongoing momentum in
> the U.S., which grew 91%. *As tremendous of a year as 2020 was for the*
> *government segment, we believe we are just at the tip of the iceberg, and we are*
> *well positioned to capture significant new opportunities in 2021 and beyond*.

\*          \*          \*

> And while a lot of new 2020 U.S. defense opportunities started as crisis
> response to COVID, *almost all of it is relevant to enduring problems and needs*.

\*          \*          \*

> *Our pipeline is substantial and growing*. These deals, they start in the
> Acquire phase of our 3-phase model and with new customers who were acquired in
> the year that had yet to even join a phase. Both of these groups performed
> exceptionally, *a very positive forward-looking indicator*.

> Additionally, the intensive growth of existing customers continued with
> average revenue per customer growing 41% to $7.9 million. We grew the number
> of accounts with $10 million of annual revenue or more by 50%. *We're continuing*
> *to demonstrate our ability to grow customer relationships at scale as we add ever-*
> *increasing value to our customers' enterprises*.

> *And it's still very clear that we're just at the beginning. Our customers*
> *include only 8 of the Fortune 100, 12 of the Global 100 and only 24 of the Global*
> *300. The opportunity in front of us is immense and growing*.

51.     During the same call, defendant Glazer stated: "Government revenue accelerated

in the fourth quarter, growing 85% year-over-year to $190 million." Defendant Glazer also

represented that Palantir had significant visibility into its future revenue due to the large, contract-

based nature of the Company's business. Defendant Glazer stated in pertinent part as follows:

> We measure revenue visibility across several metrics. *First, we ended 2020*
> *with total deal value across the business of $2.8 billion*, while year-end dollar-
> weighted average contract duration was 3.6 years. *This growth rate is particularly*
> *strong when considering government customers entered into shorter-than-usual*

*contracts in 2020 to accelerate procurement as they responded to the COVID crisis and moved quickly on various modernization efforts across both defense and civilian agencies. We expect a tailwind for government as these customers renew and expand.*

*Second, our remaining performance obligations as of December 31, 2020, was $597 million, up 124% year-over-year, while current RPO increased 114% year-over-year.* Although RPO provides a limited view into our business, as many of our contracts across our government and commercial segments feature termination for convenience clauses, the growth in these metrics is representative of the ongoing momentum we are seeing in our business.

Third, we look at annual contract value booked in year on a dollar-weighted duration basis. *In 2020, the dollar-weighted annualized contract value we closed increased 49% year-over-year, providing a strong foundation for fueling growth in 2021 and beyond across both our commercial and government segments.*

Looking at the business through the lens of our 3-phase model, we ended the year with strong performance across all 3 cohorts. Our Acquire phase customers ended 2020 generating $77 million in revenue with 17% contribution margin, with nearly half of the revenue from these customers coming in the fourth quarter. *This rapid scaling and expanding contribution margin demonstrates the increasing efficiency of our customer acquisition and onboarding process, which we believe will help fuel an expanding pipeline into 2021 and beyond.*

52.     Defendant Glazer further stated that, starting in 2021, Palantir was expected to achieve "greater than 30% annual revenue growth each year for the next 5 years." Defendant Sankar followed up on this long-term guidance by stating: "We are very much at the beginning here. We just did . . . 47% growth in 2020. We expect to do 45% growth in Q1 of 2021."

53.     On February 26, 2021, Palantir filed with the SEC an annual report on Form 10-K which contained the financial information provided in the FY20 Release and which was signed by defendants Karp, Glazer, Cohen, Thiel, Rascoff, Schiff, and Moore. The Form 10-K further highlighted Palantir's deal value, stating in pertinent part as follows:

*As of December 31, 2020, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government customers,* including existing contractual obligations and contractual options

- 18 -

available to those customers, *was $2.8 billion. Of our total remaining deal value, as of December 31, 2020, $1.5 billion was the remaining deal value of our contracts with commercial customers and $1.3 billion was the remaining deal value of our contracts with government custom*ers.

54.     On May 11, 2021, Palantir issued a press release providing the Company's financial results for the first quarter ended March 31, 2021 (the "1Q21 Release"). The 1Q21 Release stated that Palantir had $341 million in revenue for the quarter, up 49% year-over-year. The release also stated that Palantir's U.S. commercial revenue and its U.S. government revenue had risen 72% and 83%, respectively, during the quarter. The release stated that, for the second quarter of 2021, Palantir expected $360 million in revenue and, "[p]er long-term guidance policy, as provided by . . . Karp," annual revenue growth of 30% or greater for 2021 through 2025.

55.     Also on May 11, 2021, Palantir held an earnings conference call with analysts and investors led by defendants Glazer, Kawasaki, and Sankar to discuss the Company's first quarter 2021 results. In his prepared remarks, defendant Sankar stated that Palantir would continue to grow, stating that an "efficacious" government response to the pandemic and "commercial tailwind" continued to propel the Company's growth. Defendant Sankar continued:

> In the U.S., in particular, we continue to generate exceptional results, where revenue grew 83% in the U.S. government and 72% in commercial. And we have a lot of headroom for growth in these markets. We only have a handful of Fortune 500 customers and less than 0.1% of annual defense spending.

In particular, defendant Sankar highlighted the purported durability of Palantir's government revenue growth, stating in pertinent part as follows:

> In parallel, *the momentum in our government business continues unabated*. First quarter government revenue increased 76% year-over-year, fueled in large part by the 83% year-over-year growth we generated in the U.S. government. *We continue to play a critical role in helping governments respond to the pandemic and further our mission to become the central operating system*

*for defense.  **The scope of our government work is broadening on the back of cutting-edge product like Apollo for Edge AI and investments in distribution**.*

56.    In the commercial segment, defendant Sankar claimed that recent investments that Palantir had made in and partnerships with early stage companies, including companies like Lilium and Sarcos which were going public via a SPAC, offered tremendous opportunities to grow Palantir's client base and expand the use of its products.  Defendant Sankar stated in pertinent part as follows:

> And it's not just established industry players where we are winning, we are ***seeing opportunities for companies to build their digital infrastructure around Foundry from day 0 where they can shave years off their ramps and mountains of risk off their road maps by cost efficiently standing on the shoulders of 15 years and more than $2 billion of R&D.  And we see this as the first salvo in expanding distribution of Foundry to broader markets and a broader set of customers***.

> In Q1, we entered into a partnership with Lilium, a revolutionary eVTOL transportation company that will use Foundry to build an integrated business from the ground up, incorporating design and engineering, procurement, testing, production, quality, logistics and in-service operations.  We have also partnered with Sarcos.

> We have always talked about Gotham as the digital Iron Man suit.  Well, these guys, they're building the physical Iron Man suit.  Sarcos will leverage Foundry for all of Palantir's well-understood industrials and manufacturing use cases.  But you can see how Sarcos can leverage all the capabilities of Apollo for Edge AI to push AI into their exoskeletons.  This is Jarvis, Tony Stark's digital assistant, but in real life.  ***These customers and even more prospects in our pipeline are at the forefront of the next major sea change software, architecting an entire organization around a common operating picture to deliver a connected company from the very beginning, eliminating the chains of silo data systems***.

> ***We are investing in innovation in the west, backing companies with ambitious goals and executing on our ability to move down market.  And the fit is natural, our software can radically accelerate production ramps and time to market and help these companies get to scale on dramatically shorter time horizons***.

57.    Later in the call, defendant Glazer again highlighted the purported strength and durability of Palantir's government segment, stating: "First quarter government revenue was $208

- 20 -

million, up 76%.  U.S. government revenue increased 83% year-over-year in the first quarter, and

international government revenue increased 57% year-over-year."  Defendant Glazer continued:

"We expect this momentum to continue as we have a significant pipeline of government deals

building in Q2 and beyond that we believe will fuel durable, elevated growth in our government

segment."  Defendant Glazer further stated: "We ended the first quarter with total remaining value

of $2.8 billion, up 40% year-over-year."

58.    During the question-and-answer portion of the call, an analyst asked defendant

Sankar about the sustainability of Palantir's government growth "post-COVID" and whether he

still believed "there's a considerable amount of long tail" for that segment.  Defendant Sankar

responded by stating that Palantir's government business was "accelerat[ing]" and would remain

robust long after the pandemic ended, stating in pertinent part as follows:

> ***That's absolutely right.  There are a lot of things that got started as a result of COVID, but many of those things were not related to COVID response per se***.  It's really the fact that something had to be delivered, and it had to work in days, it showed many of the customers where their bespoke, custom-build approach was just never going to get there and allow them to mark-to-market whether a faster buy solution was going to work.  And so we've seen that across the business, of course, the work with the National Nuclear Security Administration is not directly COVID related at all, but it's certainly accelerated by this.
>
> ***We've seen work across health care, DoD, civilian agencies, accelerate inside the U.S. and outside of the U.S.  We've also seen that the pipeline is continuing to build there.  We're expecting a lot of defense-related activity to build over the back half of the year and into next year***.  We participate in the global information dominance experiment with 11 combat command, that was not even visible during the contact that we build here.  So quite excited about the pace at which these things are building.  And if you think about Apollo for Edge AI, most of the capabilities we're looking at, they didn't even exist around the time of the listing, like the pace at which we are innovating on the product is probably one of the most exciting things, and that is what is creating these opportunities that are compounding.

- 21 -

59.     On May 12, 2021, Palantir filed with the SEC a quarterly report on Form 10-Q which contained the financial information provided in the 1Q21 Release, and which was signed by defendants Karp and Glazer.  The Form 10-Q discussed several "investments" that Palantir had recently made, including a $21 million investment in Rotor Acquisition Corp., a $30 million investment in Montes Archimedes Acquisition Corp., a $20 million investment in GX Acquisition Corp., and a $20 million investment in an undisclosed SPAC.  In each case, Palantir entered into a multi-year subscription agreement with the entity involved pursuant to which the entity paid Palantir millions of dollars to use the Company's products and services.  The Form 10-Q further highlighted Palantir's deal value, stating in pertinent part as follows:

> *As of December 31, 2020, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government customers*, including existing contractual obligations and contractual options available to those customers, *was $2.8 billion.  Of our total remaining deal value, as of December 31, 2020, $1.5 billion was the remaining deal value of our contracts with commercial customers and $1.3 billion was the remaining deal value of our contracts with government customers*.

60.     On August 12, 2021, Palantir issued a press release providing the Company's financial results for the first quarter ended June 30, 2021 (the "2Q21 Release").  The 2Q21 Release stated that Palantir had $376 million in revenue for the quarter, up 49% year-over-year.  The release also stated that Palantir's U.S. commercial revenue had risen 90% during the quarter and that Palantir had closed an impressive 62 deals of $1 million or more and grown its commercial customer count by 32% during the quarter.  The release reaffirmed the Company's long-term revenue guidance and stated that Palantir expected $385 million in revenue during the third quarter of 2021.

61.     Also on August 12, 2021, Palantir held an earnings conference call with analysts and investors led by defendants Glazer, Kawasaki, and Sankar to discuss the Company's second quarter 2021 results.  During his prepared remarks, defendant Sankar highlighted the Company's partnerships with promising early stage companies, which he referred to as "young guns," that were purportedly making great use of the Company's software, stating in pertinent part as follows:

> And these young guns, they see Foundry as an alternative to building bespoke solutions in AWS or Azure or any other cloud.  They need software today that is ready for any tomorrow.  Our software is that enabling platform, and a growing number of companies from early stage to newly public companies, they're pursuing that vision on Foundry.  We refer to these organizations as day 0 companies.
>
> The innovation in our distribution is enabling us to partner with these organizations across many industries as they build their offerings on Foundry.  For example, in biotech, Cellularity is leveraging our experience in both pharma R&D and manufacturing to accelerate drug development and set a new standard for cell-based therapies.  Roivant is drawing on the work that we've done, spanning pharma companies like Sanofi and Merck Group and public health platforms like N3C UNITE to pool and share trial data with development partners and build out real-world evidence capabilities to support key disease areas.
>
> In automotive, Wejo is building a SaaS ecosystem connected vehicle data spanning use cases across OEMs, suppliers, insurers and government authorities on top of foundry.  In logistics, Box is building a digital twin, incorporating both shipment and sales operations, spanning raw materials all the way through to end customers, and just so much more.
>
> We are making Foundry accessible to even more day 0 companies with Foundry for Builders, a program which supports early-stage companies with access to Foundry, allowing these companies to build their operations on Foundry from the outset, enabling them not just to efficiently manage, but actually to wield the increasing complexity of their growing businesses to disrupt incumbents and to win in the marketplace.
>
> And while competitors are bogged down by legacy IT investments and an obsession with reinventing every wheel internally, these companies, they have no IT catalog.  They are just founders, entrepreneurs and engineers focused on winning, and they see Foundry as the best way to do that.
>
> This program includes companies like Chapter, who is revolutionizing the consumer experience in Medicare plan selection and enrollment; or Gecko

- 23 -

Robotics, who is building bada** robots for industrial inspections; and Origin Materials, which is helping companies decarbonize their supply chains to achieve net 0 and really, net negative carbon footprints. And we plan to extend this offering to more early-stage companies in a variety of industries over time. *We see substantial opportunity to grow our business and push the ambition of our product with these day 0 companies, and we couldn't be more excited to power the next generation of builders*.

62.    As to Palantir's government business, defendant Sankar stated that Palantir "continue[s] to see a broadening scope of opportunities and expansion of work that we're doing across defense, health care and other critical initiatives" as the Company's "work in government continues to expand beyond defense and health care."

63.    During his prepared remarks, defendant Glazer stated: "We ended the second quarter with total remaining deal value of $3.4 billion, up 63% year-over-year, while commercial deal value was up 122% year-over-year to $2.1 billion."

64.    Later in the call, defendant Sankar answered a question about what gave "management confidence" that Palantir could improve shareholder returns over time. Defendant Sankar responded by saying that the changes from the pandemic that had led to Palantir's recent growth were "not going away," stating in pertinent part as follows:

Look, Humpty Dumpty had a great fall. *The world has changed and it isn't going back*. We built software for the world we are in now and the world we will continue to be in. We saw that coming. We anticipated the future needs. Supply chains will never be the same. It isn't just about today's shortages. The old world is fixated on the accuracy of the forecast. The new world is all about how well you manage the error in your forecast. The error is the signal. The error is the opportunity to win.

*Health care is never going to be the same. It's not just about the vaccine*, it's going to be about working through the 18-month backlog and the impact on morbidity and mortality from delayed and deferred diagnosis. *Energy will never be the same. Every industry has been transformed*. Our customers, they were disappointed, and frankly, angry by how few of their IT investments over the last decade rose to its needed moment. It was a huge mark-to-market. It was ugly.

- 24 -

*The reality is that shocks will be more frequent. This isn't a one-off. It's the new normal. Years of investing mindlessly in efficiency has resulted in enormous fragility. We are the resilient operating system for the future champions.*

65.    On August 12, 2021, Palantir filed with the SEC a quarterly report on Form 10-Q which contained the financial information provided in the 2Q21 Release, and which was signed by defendants Karp and Glazer ("2Q21 Form 10-Q"). The 2Q21 Form 10-Q discussed $250 million in "investments" that Palantir had made with various early stage companies, as well as up to $428 million worth of contracts that Palantir had entered into with these same companies to allow them to use the Company's products and services, stating in pertinent part as follows:

The Company approved and entered into certain agreements ("Investment Agreements") to purchase, or commit to purchase, shares of various entities, including special purpose acquisition companies and/or other privately-held or publicly-traded entities (each, an "Investee," and such purchases, or commitments to purchase, the "Investments"). *As of June 30, 2021, the Company had outstanding commitments, subject to the applicable terms and conditions, to purchase a total of 25.0 million shares for an aggregate purchase price of $250.0 million*. The closings of certain of such Investments are contingent upon the completion of a proposed business combination between the applicable Investee and other applicable parties. As of June 30, 2021, none of such Investments had closed.

*Additionally, in connection with signing the Investment Agreements, each Investee or an associated entity and the Company entered into a commercial contract for access to the Company's products and services. The maximum potential revenue from these commercial contracts is $428 million, which is inclusive of $73 million from contractual options, and the terms of such contracts, including these contractual options, range from three to ten years*. The majority of these commercial contracts are subject to various termination provisions, including for convenience in the event a proposed business combination is not completed.

The Company assessed the concurrent agreements under the non-monetary guidance within Accounting Standards Codification ("ASC") 606 – *Revenue from Contracts with Customers* and **the total revenue recognized from such commercial contracts during the three and six months ended June 30, 2021 was $3.0 million**.

- 25 -

66.    The 2Q21 Form 10-Q further highlighted Palantir's deal value, stating in pertinent part as follows:

> *As of December 31, 2020, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government customers*, including existing contractual obligations and contractual options available to those customers, *was $2.8 billion.  Of our total remaining deal value, as of December 31, 2020, $1.5 billion was the remaining deal value of our contracts with commercial customers and $1.3 billion was the remaining deal value of our contracts with government customers*.

67.    The statements referenced in ¶¶36-66 above were materially false and misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition, as follows:

(a)    that, in 2020 and early 2021, Palantir's government revenue and deal value had been temporarily inflated by short-term contracts that the Company had entered into in connection with government responses to the COVID-19 pandemic and that the short-term boosts to the Company's government revenue stream were not internally expected to continue after the relevant contracts ended;

(b)    that Palantir had failed to secure additional government contracts, including those purportedly tied to increased geopolitical instability or uncertainty, sufficient to offset the expected loss of the temporarily increased government revenue received by Palantir from contracts arising from government responses to the COVID-19 pandemic;

(c)    that the recent growth rate of Palantir's government revenue and deal value was unsustainable and internally expected to decelerate and potentially even decline by the end of 2021;

- 26 -

(d)     that, beginning at least by April 2021, in an attempt to offset expected declines in Palantir's government business Palantir had artificially inflated its deal value, commercial client base, and short-term commercial client revenue by investing in largely non-viable businesses, consisting primarily of SPAC target companies, on the condition that these businesses enter into contracts for Palantir's products and services purportedly worth hundreds of millions of dollars;

(e)     that Palantir was unlikely to ever receive a substantial portion of the revenue contracted for under the Company's SPAC Investment Strategy, as the involved companies were largely non-viable businesses unable to pay for Palantir's products and services for the duration of the relevant contract periods;

(f)     that hundreds of millions of dollars' worth of Palantir's investments in early stage companies made through the Company's SPAC Investment Strategy were at a substantial, undisclosed risk of being written down;

(g)     that, as a result of (a)-(f) above, Palantir's claim of greater than 30% annual revenue growth every year from 2021 to 2025 lacked a reasonable basis in fact and was not obtainable; and

(h)     that, as a result of (a)-(g) above, Palantir's historical revenue, deal value, and client metrics and defendants' statements about the Company's business, operations, and prospects were materially misleading at all relevant times.

68.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Registration Statement and Palantir's quarterly and annual financial reports filed with the SEC to "[d]escribe any known trends or uncertainties that have had or that are

reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Palantir] speculative or risky," and an explanation of "how each risk affect[ed] [Palantir] or the securities being offered." Defendants' failure to disclose that Palantir had temporarily inflated its revenue, deal value, client base, and other key metrics through short-term government contracts tied to the COVID-19 pandemic and the Company's SPAC Investment Strategy, via which Palantir had invested hundreds of millions of dollars in non-viable businesses in exchange for significant contract commitments, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, the failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Palantir speculative or risky.

69.     Then, on November 9, 2021, Palantir issued a press release providing the Company's financial results for the third quarter ended September 30, 2021 (the "3Q21 Release"). The 3Q21 Release signaled a significant deceleration in Palantir's revenue growth, including quarterly revenue of $392 million, or 36% year-over-year revenue growth, and projected fourth quarter revenue of $418 million, which would represent 30% year-over-year revenue growth, compared to 49% year-over-year revenue growth in the prior quarter. That same day, Palantir also filed with the SEC a quarterly report on Form 10-Q which contained the financial information provided in the 3Q21 Release and which was signed by defendants Karp and Glazer ("3Q21 Form

10-Q"). The 3Q21 Form 10-Q revealed that Palantir's government revenue had actually ***declined***

on a sequential basis to $218 million for the quarter.

70.     The price of Palantir Class A common stock plummeted on this news, falling nearly

16% over two trading days to $22.52 per share by market close on November 10, 2021, on

abnormally high trading volume. However, the price of Palantir stock remained artificially inflated

because defendants failed to disclose the whole truth. Moreover, defendants continued to make

materially false and misleading statements that artificially inflated the price of Palantir Class A

common stock.

71.     The 3Q21 Release stated that Palantir's commercial customer count had grown

46% quarter-over-quarter and that its U.S. commercial revenue had grown 103% year-over-year

during the quarter.

72.     Similarly, the 3Q21 Form 10-Q stated that Palantir had entered into various

commercial contracts with early stage companies in which it had invested worth up to $640.2

million, stating in pertinent part as follows:

> The Company approved and entered into certain agreements ("Investment
> Agreements") to purchase, or commit to purchase, as further discussed in *Note 8.*
> *Commitments and Contingencies – Investment Commitments*, shares of various
> entities, including special purpose acquisition companies and/or other privately-
> held or publicly-traded entities (each, an "Investee," and such purchases, and
> commitments to purchase, the "Investments"). ***In connection with signing the***
> ***Investment Agreements, each Investee or an associated entity and the Company***
> ***entered into a commercial contract for access to the Company's products and***
> ***services. The maximum potential revenue from all of these commercial contracts***
> ***is $640.2 million, which is inclusive of $82.9 million of contractual options***. The
> terms of such contracts, including such contractual options, range from three to ten
> years. The majority of these commercial contracts are subject to various
> termination provisions, including for convenience in the event a proposed business
> combination is not completed.

During 2021, the Company assessed the concurrent agreements under the non-monetary guidance within Accounting Standards Codification ("ASC") 606 – *Revenue from Contracts with Customers* and **the total revenue recognized from the commercial contracts during the three and nine months ended September 30, 2021 was $19.0 million and $22.0 million, respectively**.

73.     Also on November 9, 2021, Palantir held an earnings conference call with analysts and investors led by defendants Glazer, Kawasaki, and Sankar to discuss the Company's third quarter 2021 results.  During his prepared remarks, defendant Sankar lauded the Company's purported commercial client and revenue growth, stating in pertinent part as follows:

It was a fantastic quarter across the board.  In Q3, total revenue grew 36%. Commercial revenue growth has accelerated in every quarter over the last year from 4% in Q4 2020 to 19% in Q1 to 28% in Q2 now 37% in Q3.  At this scale, acceleration like this is gravity defined.  ***U.S. commercial revenue growth accelerated once again to 103% year-over-year.  We added 34 net new customers in Q3.  To put this in perspective, our commercial customer count grew by 46% sequentially.  We have more than doubled our commercial customer count at the beginning of the year.  We closed 54 deals of $1 million or more, 33 of which were $5 million or more and 18 of which were $10 million or more***.

74.     Defendant Sankar also highlighted Palantir's clients procured through the Company's SPAC Investment Strategy, stating in pertinent part as follows:

Companies needed to move beyond visibility, beyond analytical insights, to having the technical infrastructure, to translate that into coordinated, orchestrated actions in the operations of their business.  And one of the coolest places to see this working is with our Day 0 companies.  These companies have enormous ambition and deeply value the step change in speed and the reduction of expenses Foundry delivers when consumed as Infrastructure as a Service.  Wejo is able to develop market-ready applications in as little as 6 weeks on Foundry.  Sarcos is integrating 0.5 trillion data points per month to accelerate design, maintenance and commercialization of their Iron Man suits.  Lilium is flying through ground and flight testing [wielding] the vast data generated by every sensor streaming from the aircraft.

\*      \*      \*

**We started this program to supercharge earlier-stage companies, enabling them to create a central operating system for their data and to scale rapidly from Day**

- 30 -

*0.  These companies, they're not just managing their data and their operations, they are wielding them to blitz, scale and win*.

75.    During the call, defendant Glazer discussed results in Palantir's government business and emphasized the purported "101%" increase in Palantir's remaining deal value, stating in pertinent part as follows:

> Government revenue increased 34% as we signed new deals with the Air Force, HHS and NIH, and we were recently down selected by the U.S. Army to provide its Intelligence Data Fabric and Analytics solution under CD-2.  In the third quarter, we closed 54 deals of $1 million or more in total contract value, including 33 deals of $5 million or more and 18 deals of $10 million or more.  *Third quarter billings increased 56% year-over-year and remaining performance obligation increased 172% year-over-year as we continue to improve contracting, push out or remove termination for convenience clauses and move to shorter duration billing cycles*.

> *Total remaining deal value increased 50% year-over-year to $3.6 billion, with commercial remaining deal value increasing 101%*.  Third quarter trailing 12-month revenue per customer was $7 million, down sequentially and reflecting continued acceleration in customer acquisition as we added 34 net new customers in the quarter.

> *We continue to expect rapid expansion in our customer base moving forward as we invest in our sales teams and channel partners, and we would expect average revenue per customer to continue to taper as a result of our growing customer count*.  When excluding new customers added in the quarter, average revenue per customer was $8.8 million, up 26% year-over-year.  And we continue to generate strong growth with our largest customers.  Trailing 12-month revenue per top 20 customers was $41.3 million, up 35% year-over-year.

76.    Later in the call, when defendant Sankar was asked to comment on Palantir's government business, he responded in pertinent part: "This pipeline in aggregate is big and building. . . .  We are just at the beginning of big secular trends here, trends that we anticipated and have invested in for years.  We are uniquely positioned, cutting-edge product ready to meet at the moment."

- 31 -

77. Similarly, defendant Glazer highlighted the purported strength in Palantir's commercial business, stating in pertinent part as follows:

> *We mentioned we've more than doubled our commercial customer count this year, and those numbers are accelerating, growing our installation base is really great because we expand in places where we are*. If you look at our top customers, average over $40 million a year of revenue. That's up 35% year-over-year. Our average revenue per customer was $8.8 million when excluding new customers. So lot of room to expand as we expand our customer base.
>
> *Another big driver, U.S. commercial revenue, where we've seen acceleration, we mentioned up to 103% growth, doubling in Q3.*
>
> *Our forward indicators also really strong. Total deal value up 50% to $3.6 billion. Total deal value in commercial doubled to $2.2 billion.*
>
> *Our third straight quarter of accelerating commercial revenue. And just to wrap up, commercial revenue up 21% sequentially quarter-over-quarter*.

78. The statements referenced in ¶¶71-77 above were materially false and misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition, as follows:

(a)    that, in 2020 and early 2021, Palantir's government revenue and deal value had been temporarily inflated by short-term contracts that the Company had entered into in connection with government responses to the COVID-19 pandemic and that the short-term boosts to the Company's government revenue stream were not internally expected to continue after the relevant contracts ended;

(b)    that Palantir had failed to secure additional government contracts, including those purportedly tied to increased geopolitical instability or uncertainty, sufficient to offset the expected loss of the temporarily increased government revenue received by Palantir from contracts arising from government responses to the COVID-19 pandemic;

- 32 -

(c)    that the recent growth rate of Palantir's government revenue and deal value was unsustainable and internally expected to decelerate and potentially even decline by the end of 2021;

(d)    that, beginning at least by April 2021, in an attempt to offset expected declines in Palantir's government business Palantir had artificially inflated its deal value, commercial client base, and short-term commercial client revenue by investing in largely non-viable businesses, consisting primarily of SPAC target companies, on the condition that these businesses enter into contracts for Palantir's products and services purportedly worth hundreds of millions of dollars;

(e)    that Palantir was unlikely to ever receive a substantial portion of the revenue contracted for under the Company's SPAC Investment Strategy, as the involved companies were largely non-viable businesses unable to pay for Palantir's products and services for the duration of the relevant contract periods;

(f)    that hundreds of millions of dollars' worth of Palantir's investments in early stage companies made through the Company's SPAC Investment Strategy were at a substantial, undisclosed risk of being written down;

(g)    that, as a result of (a)-(f) above, Palantir's claim of greater than 30% annual revenue growth every year from 2021 to 2025 lacked a reasonable basis in fact and was not obtainable; and

(h)    that, as a result of (a)-(g) above, Palantir's historical revenue, deal value, and client metrics and defendants' statements about the Company's business, operations, and prospects were materially misleading at all relevant times.

79.     Defendants' failure to disclose that Palantir had temporarily inflated its revenue, deal value, client base, and other key metrics through short-term government contracts tied to the COVID-19 pandemic and the Company's SPAC Investment Strategy, via which Palantir had invested hundreds of millions of dollars in non-viable businesses in exchange for significant contract commitments, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.  Furthermore, the failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Palantir speculative or risky.

80.     Then, on February 17, 2022, Palantir issued a press release providing the Company's financial results for the fourth quarter and full year ended December 31, 2021 (the "FY21 Release").  The FY21 Release revealed that Palantir's government business continued to quickly decelerate to just 26% year-over-year growth during the quarter, compared to a 76% year-over-year growth rate earlier in the year.  That same day, Palantir released accompanying remarks which revealed that Palantir's total deal value at quarter's end was $3.8 billion, which also signaled significant business deceleration.  Furthermore, factoring out Palantir's SPAC Investment Strategy, Palantir's total deal value was essentially *flat* year-over-year.  Although Palantir did not break out government sector total deal value in the accompanying remarks, as would later be revealed Palantir's total remaining deal value with its government customers had actually *declined* by $100 million by the end of the year.

81.     The price of Palantir Class A common stock plummeted on this news, falling nearly 16% over a single trading day to $11.77 per share by market close on February 17, 2022, on

abnormally high trading volume.  However, the price of Palantir stock remained artificially inflated because defendants failed to disclose the whole truth.  Moreover, defendants continued to make materially false and misleading statements that artificially inflated the price of Palantir Class A common stock.

82.    The FY21 Release stated that Palantir had added 34 net new customers in the fourth quarter of 2021 and that the Company's U.S. commercial revenue had grown 132% year-over-year during the quarter.

83.    Also on February 17, 2022, Palantir held an earnings conference call led by defendant Karp with analysts and investors to discuss the Company's fourth quarter and full year 2021 results.  During the call, defendant Karp claimed that Palantir was on track to "double" its U.S. commercial growth in 2022, stating: "Obviously, to the extent we get this to work, you could expect even higher growth than what we have, although I'm very happy with.  It was like we've doubled USG U.S. commercial now from 50 to 100, 100 to 200.  I believe we will double it again this year."  Defendant Karp also claimed that Palantir's commercial growth was not dependent on SPAC investments, stating that "even if you adjust for SPAC organic growth in commercial last year, U.S. was 80% or just under 80%, it's like 76%, 77%. . . .  [N]et dollar retention numbers that you financial people like, how much is it growing? . . . Very, very strong like in the 150% range."

84.    Later in the call, when defendant Karp was asked about the deceleration in government revenue, he claimed that the slowdown reflected short-term "lumpiness" that would end, stating: "One, what will happen this year?  Are there – is a deceleration in actual one over a long time series?  The answer is clearly no."  Defendant Karp continued:

> The danger of the world being clear and present to the U.S. government is very protective.  It doesn't guarantee that when this integral, actually how it behaves,

- 35 -

but it makes it much more likely that it will happen in here and positively affect our revenue, which is another reason why I suspect that we will do well.

85.    On February 24, 2022, Palantir filed with the SEC an annual report on Form 10-K which contained the financial information provided in the FY21 Release, and which was signed by defendants Karp, Glazer, Cohen, Thiel, Rascoff, Schiff, and Moore ("2021 Form 10-K").  The 2021 Form 10-K stated that Palantir had entered into various commercial contracts with early stage companies in which it had invested worth up to $767.9 million, stating in pertinent part as follows:

> During 2021, the Company approved and entered into certain agreements ("Investment Agreements") to purchase, or commit to purchase, as further discussed in *Note 9.  Commitments and Contingencies – Investment Commitments*, shares of various entities, including special purpose acquisition companies and/or other privately-held or publicly-traded entities (each, an "Investee," and such purchases, and commitments to purchase, the "Investments").  In connection with signing the Investment Agreements, each Investee or an associated entity and the Company entered into a commercial contract for access to the Company's products and services.  ***The total value of such commercial contracts was $767.9 million as of December 31, 2021, which is inclusive of $116.2 million of contractual options***.  The terms of such contracts, including contractual options, range from three to ten years.   The majority of these commercial contracts are subject to various termination provisions, including for convenience in the event a proposed business combination is not completed.

> During 2021, the Company assessed the concurrent agreements under the non-monetary guidance within ASC 606 – *Revenue from Contracts with Customers* as well as the commercial substance of each arrangement considering the customer's ability and intention to pay as well as the Company's obligation to perform under each contract.  ***The total revenue recognized from these commercial contracts during the year ended December 31, 2021 was $48.3 million***.

86.    The 2021 Form 10-K further highlighted Palantir's deal value, stating in pertinent part as follows:

> ***As of December 31, 2021, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government customers***, including existing contractual obligations and contractual options available to those customers, ***was $3.8 billion***.  Of our total remaining deal value, as of December 31, 2021, $2.6 billion was the remaining deal value of our contracts

with commercial customers and $1.2 billion was the remaining deal value of our contracts with government customers.

87.     The statements referenced in ¶¶82-86 above were materially false and misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition, as follows:

(a)     that, in 2020 and early 2021, Palantir's government revenue and deal value had been temporarily inflated by short-term contracts that the Company had entered into in connection with government responses to the COVID-19 pandemic and that the short-term boosts to the Company's government revenue stream were not internally expected to continue after the relevant contracts ended;

(b)     that Palantir had failed to secure additional government contracts, including those purportedly tied to increased geopolitical instability or uncertainty, sufficient to offset the expected loss of the temporarily increased government revenue received by Palantir from contracts arising from government responses to the COVID-19 pandemic;

(c)     that the recent growth rate of Palantir's government revenue and deal value was unsustainable and internally expected to decelerate and potentially even decline by the end of 2021;

(d)     that, beginning at least by April 2021, in an attempt to offset expected declines in Palantir's government business Palantir had artificially inflated its deal value, commercial client base, and short-term commercial client revenue by investing in largely non-viable businesses, consisting primarily of SPAC target companies, on the condition that these businesses enter into contracts for Palantir's products and services purportedly worth hundreds of millions of dollars;

(e)    that Palantir was unlikely to ever receive a substantial portion of the revenue contracted for under the Company's SPAC Investment Strategy, as the involved companies were largely non-viable businesses unable to pay for Palantir's products and services for the duration of the relevant contract periods;

(f)    that hundreds of millions of dollars' worth of Palantir's investments in early stage companies made through the Company's SPAC Investment Strategy were at a substantial, undisclosed risk of being written down;

(g)    that, as a result of (a)-(f) above, Palantir's claim of greater than 30% annual revenue growth every year from 2021 to 2025 lacked a reasonable basis in fact and was not obtainable; and

(h)    that, as a result of (a)-(g) above, Palantir's historical revenue, deal value, and client metrics and defendants' statements about the Company's business, operations, and prospects were materially misleading at all relevant times.

88.    Defendants' failure to disclose that Palantir had temporarily inflated its revenue, deal value, client base, and other key metrics through short-term government contracts tied to the COVID-19 pandemic and the Company's SPAC Investment Strategy, via which Palantir had invested hundreds of millions of dollars in non-viable businesses in exchange for significant contract commitments, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.  Furthermore, the failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Palantir speculative or risky.

89.     Then, on May 9, 2022, Palantir issued a press release providing the Company's financial results for the first quarter ended March 31, 2022 (the "1Q22 Release").  The 1Q22 Release revealed that Palantir expected only $470 million in revenue for the second quarter of 2022, which would represent only 25% year-over-year growth – substantially below the Company's purported long-term revenue growth rate.  That same day, Palantir filed with the SEC a quarterly report on Form 10-Q which contained the financial information provided in the 1Q22 Release and which was signed by defendants Karp and Glazer ("1Q22 Form 10-Q").  The 1Q22 Form 10-Q revealed that Palantir had received over $39 million in revenue from its SPAC Investment Strategy during the quarter, meaning that without this program standalone revenue growth would have been *only 19%* during the first quarter of 2022.  During a related earnings call, Palantir executives further revealed that the Company's total deal value had actually *declined by $300 million* during the quarter to $3.5 billion and that the Company would be winding down its SPAC Investment Strategy.

90.     The price of Palantir Class A common stock plummeted on this news, falling 21% over a single trading day to $7.46 per share by market close on May 9, 2022, on abnormally high trading volume.  However, the price of Palantir stock remained artificially inflated because defendants failed to disclose the whole truth.  Moreover, defendants continued to make materially false and misleading statements that artificially inflated the price of Palantir Class A common stock.

91.     The 1Q22 Release stated that Palantir's customer count grew 86% year-over-year and that the Company's U.S. commercial revenue had grown 136% year-over-year during the quarter.

92.    Similarly, the 1Q22 Form 10-Q stated that Palantir had entered into various commercial contracts with early stage companies in which it had invested worth up to $754.9 million, stating in pertinent part as follows:

> Since 2021, the Company has approved and entered into certain agreements ("Investment Agreements") to purchase, or commit to purchase, as further discussed in *Note 7. Commitments and Contingencies – Investment Commitments*, shares of various entities, including special purpose acquisition companies and/or other privately-held or publicly-traded entities (each, an "Investee," and such purchases, and commitments to purchase, the "Investments"). In connection with signing the Investment Agreements, each Investee or an associated entity and the Company entered into a commercial contract for access to the Company's products and services. ***The total value of such commercial contracts was $754.9 million as of March 31, 2022, which is inclusive of $116.2 million of contractual options***. The terms of such contracts, including contractual options, range from three to ten years. The majority of these commercial contracts are subject to various termination provisions, including for convenience in the event a proposed business combination is not completed.

> The Company assesses the concurrent agreements under the non-monetary guidance within ASC 606 – *Revenue from Contracts with Customers* as well as the commercial substance of each arrangement considering the customer's ability and intention to pay as well as the Company's obligation to perform under each contract. ***The total revenue recognized from these commercial contracts during the three months ended March 31, 2022 was $39.2 million***.

93.    On May 9, 2022, Palantir held an earnings conference call with analysts and investors led by defendants Karp, Glazer, Kawasaki, and Sankar to discuss the Company's first quarter 2022 results. During his prepared remarks, defendant Glazer highlighted the purported durability of the Company's revenue growth trends in both its commercial and government segments, stating in pertinent part as follows:

> As Alex and Shyam highlighted, we're uniquely positioned for unstable times. We work with some of the most crucial and important institutions in the world. ***The U.S. government was 42% of our first quarter revenue and has been a leading driver of growth for 8 years, with a 30% CAGR from 2013 to 2021, which we view as a long-term trend***.

More fundamentally, we believe supplying our products to the U.S. government and her allies is a core pillar of our business. As Alex mentioned, in the face of substantial macroeconomic and geopolitical challenges and uncertainty, *the quality of our revenue as viewed through growth, margin performance and durability and especially resilience is unique to Palantir*.

As Alex wrote in his letter, we combine the resilience of the defense industrial sector with the growth of a software company. In the face of our customers' challenges, we have and will continue to incur expenses prior to having contracts in the delivery of mission-critical capabilities. Following these investments, *we expect acceleration of our U.S. government revenue into the second half of the year. In Q2 to date, we've already seen the reacceleration of U.S. government revenue and expect acceleration of the overall government segment to follow in the next quarter or shortly thereafter*.

I'll now review our first quarter performance, followed by our outlook. First quarter revenue grew 31% year-over-year ahead of our prior guidance to $446 million. Overall net dollar retention was 124%. *Commercial revenue growth accelerated for the fifth consecutive quarter*. First quarter commercial revenue increased 54% year-over-year to $205 million, up from a 47% increase in the fourth quarter. *Commercial growth continues to be driven by our U.S. business as U.S. commercial revenue growth accelerated to 136% in the first quarter, up from 132% in Q4*.

94.    Defendant Glazer also reaffirmed the Company's long-term revenue guidance, stating:

Continuing to execute the guidance strategy set forth by our CEO, Alex Karp, in our year-end 2020 earnings call with regard to long-term revenue guidance, we are providing and will continue to provide guidance of 30% or greater revenue growth for this year and the next 3 years at each earnings call.

95.    During the call, defendant Sankar stated that Palantir's U.S. government business was experiencing "reacceleration," stating in pertinent part as follows:

We've been working with the U.S. government for 15 years. And over the last decade, we've seen a 30% CAGR, and that covers times at peace and times of conflict. And I've already talked about our involvement with current events and the role that we're playing there. *And you can kind of see the reacceleration starting to happen with the wins*.

*        *        *

- 41 -

*And so the end result of this is that in Q2, we've started to see the U.S. government business reaccelerate*.  We're doing a substantial amount of work right now where we are investing in our customers, and we expect that work to have both short term but also longer-term payouts.  We're doing work now that matters and will likely be contracted.  But we're also doing work that is defining the requirements for defense procurements over the decades to come here.

96.     Defendant Kawasaki similarly stated that "in Q2, we've already seen some reacceleration in the U.S. government business, which we think is a long-term trend and expect acceleration of the overall government segment this quarter or shortly after."

97.     During the call, defendant Kawasaki further represented that Palantir's commercial growth was not dependent on its SPAC Investment Strategy, stating in pertinent part as follows:

Revenue from these contracts has peaked in Q1 at around $39 million.  And we will not have additional new customers from this program as we've wound the program down.  Going forward, expect about $30 million of revenue per quarter from these customers, revenue in Q1 is higher as a result of some catch-up of about $9 million recognized in the quarter, reflecting work we started last year.  We also saw roughly a negative $0.02 impact on earnings per share from the marketable securities.

*When you look at this by geography, you'll see continued strength and growth in the U.S. business, ex SPACs, growing at 65% year-over-year and 9% sequentially quarter-over-quarter.  We had our strongest quarter for winning new commercial customers overall.  Commercial customer count up 25% sequentially and up 207% from a year ago.  And in the United States, commercial customer count grew 368%.  We expect continued growth in commercial customer acquisition.  And as Alex mentioned, we see a path to double our U.S. commercial revenue again*.

98.     The statements referenced in ¶¶91-97 above were materially false and misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition, as follows:

(a)     that, in 2020 and early 2021, Palantir's government revenue and deal value had been temporarily inflated by short-term contracts that the Company had entered into in connection with government responses to the COVID-19 pandemic and that the short-term boosts

- 42 -

to the Company's government revenue stream were not internally expected to continue after the relevant contracts ended;

(b)      that Palantir had failed to secure additional government contracts, including those purportedly tied to increased geopolitical instability or uncertainty, sufficient to offset the expected loss of the temporarily increased government revenue received by Palantir from contracts arising from government responses to the COVID-19 pandemic;

(c)      that the recent growth rate of Palantir's government revenue and deal value was unsustainable and internally expected to decelerate and potentially even decline by the end of 2021;

(d)      that, beginning at least by April 2021, in an attempt to offset expected declines in Palantir's government business Palantir had artificially inflated its deal value, commercial client base, and short-term commercial client revenue by investing in largely non-viable businesses, consisting primarily of SPAC target companies, on the condition that these businesses enter into contracts for Palantir's products and services purportedly worth hundreds of millions of dollars;

(e)      that Palantir was unlikely to ever receive a substantial portion of the revenue contracted for under the Company's SPAC Investment Strategy, as the involved companies were largely non-viable businesses unable to pay for Palantir's products and services for the duration of the relevant contract periods;

(f)      that hundreds of millions of dollars' worth of Palantir's investments in early stage companies made through the Company's SPAC Investment Strategy were at a substantial, undisclosed risk of being written down;

- 43 -

(g)    that, as a result of (a)-(f) above, Palantir's claim of greater than 30% annual revenue growth every year from 2021 to 2025 lacked a reasonable basis in fact and was not obtainable; and

(h)    that, as a result of (a)-(g) above, Palantir's historical revenue, deal value, and client metrics and defendants' statements about the Company's business, operations, and prospects were materially misleading at all relevant times.

99.    Defendants' failure to disclose that Palantir had temporarily inflated its revenue, deal value, client base, and other key metrics through short-term government contracts tied to the COVID-19 pandemic and the Company's SPAC Investment Strategy, via which Palantir had invested hundreds of millions of dollars in non-viable businesses in exchange for significant contract commitments, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.  Furthermore, the failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Palantir speculative or risky.

100.    Then, on August 8, 2022, Palantir issued a press release providing the Company's financial results for the second quarter ended June 30, 2022 (the "2Q22 Release").  The 2Q22 Release stated Palantir expected 2022 revenues to be in a range of $1.9 billion to $1.902 billion, which would represent an annual year-over-year revenue growth rate of only 23%.  The release further stated that the "revised guidance excludes *any* new major U.S. government awards." Notably, the revised guidance was substantially below the Company's long-term annual revenue guidance of at least 30%, despite defendants' reaffirming this figure nearly halfway through the

quarter, and the release did not state that this growth rate was achievable for subsequent years. According to an analyst report issued by Morgan Stanley, the failure to reiterate the Company's heavily touted long-term revenue growth rate "suggests that management believes the sales environment could prove challenging not just for the next few quarters but potentially beyond." In a related earnings call, Palantir executives admitted that the Company's deal value remained "roughly *flat* quarter-over-quarter" at $3.5 billion.

101.    On August 9, 2022, analysts at RBC Capital Markets published an analyst report that provided a deep dive into Palantir's SPAC Investment Strategy.  The report stated: "Most importantly, we estimate the SPAC-related [total contract value] potentially at-risk of not fully converting into revenue is *$406M* (note some of this may have already been recognized) and count *at least 15 SPAC customers that have substantial doubt as going concerns* (based on their respective filings)."  The report continued: "21 of these companies are now publicly listed; none of the 20 listed SPACs are trading above their $10 reference price (*the vast majority are now trading in the <$5 penny stock range*)."

102.    The price of Palantir Class A common stock plummeted on this news, falling 19% over two trading days to $9.25 per share by market close on August 9, 2022, on abnormally high trading volume.

103.    On September 23, 2022, the price of Palantir Class A common stock fell to a low of just $7.13 per share, *84% below* the Class Period high.  At the time of filing this complaint the price of Palantir stock has remained substantially below the price at the time the Offering began. Plaintiff and other members of the Class who purchased stock during the Class Period, including

purchases in or traceable to the Offering, have suffered economic losses and damages under the federal securities laws as a result of the diminution in the value of their Palantir shares.

## SECURITIES ACT ALLEGATIONS AND CLAIMS

### COUNT I

**For Violation of §11 of the Securities Act**
**Against All Defendants Except Defendants Sankar and Kawasaki**

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except defendants Sankar and Kawasaki.

106.    This Count does not sound in fraud.  For the purposes of this Count, plaintiff does not allege that the defendants named herein had scienter or fraudulent intent, which are not elements of a §11 claim.

107.    The Registration Statement for the Offering was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

108.    The defendants named herein are liable to plaintiff and the Class for the misstatements and omissions contained in the Registration Statement.

109.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

110.    By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the Securities Act.

111.    Plaintiff acquired Palantir Class A common stock in or traceable to the Offering.

112.    Plaintiff and the Class have sustained damages.  The value of Palantir Class A common stock has declined substantially subsequent to and due to defendants' violations.

113.    At the time of their purchases of Palantir Class A common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff commenced this action.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff commenced this action.

## COUNT II

### For Violation of §12(a)(2) of the Securities Act
### Against the Solicitor-Seller Defendants

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against defendants Karp, Cohen, Thiel, Sankar, Moore, Rascoff, and Schiff (the "Solicitor-Seller Defendants").

116.    This Count does not sound in fraud.  For the purposes of this Count, plaintiff does not allege that the Solicitor-Seller Defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

- 47 -

117.    By means of the defective Prospectus and other conduct alleged herein, including oral and written communications made by the Company and the Solicitor-Seller Defendants in connection with Palantir's September 9, 2020 Investor Day, the Solicitor-Seller Defendants promoted and sold the Palantir Class A common stock sold in the Offering to plaintiff and other members of the Class.

118.    The Prospectus and other Offering communications contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  The defendants named herein owed plaintiff and the other members of the Class who purchased Palantir Class A common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

119.    Plaintiff did not know, nor in the exercise of reasonable diligence could plaintiff have known, of the untruths and omissions contained in the Prospectus at the time plaintiff acquired Palantir Class A common stock.

120.    By reason of the conduct alleged herein, the Solicitor-Seller Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Palantir Class A common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their

shares, and hereby tender their common stock to defendants sued herein. Class members who have

sold their common stock seek damages to the extent permitted by law.

### COUNT III

#### For Violation of §15 of the Securities Act
#### Against the Individual Defendants and Palantir

121.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

122.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against

the Individual Defendants and Palantir.

123.    The Individual Defendants each were controlling persons of Palantir by virtue of

their positions as directors and/or senior officers of Palantir and/or as major stockholders of the

Company. The Individual Defendants each had a series of direct and/or indirect business and/or

personal relationships with other directors and/or officers and/or major stockholders of Palantir

and had the power and authority to cause the Company to engage in the wrongful conduct

complained of herein. In addition, defendants Karp, Cohen, and Thiel maintained voting control

over the Company as a result of their ownership of Palantir Class A, B, and F shares. Palantir

controlled the Individual Defendants and all of its employees. Defendants had the power to

influence or control the primary violator upon which their control person liability is based and, as

detailed herein, actively used this influence or control so as to be a culpable participant in the

primary violation. By reason of such conduct, defendants are liable pursuant to §15 of the

Securities Act.

## EXCHANGE ACT ALLEGATIONS AND CLAIMS

124. Plaintiff incorporates by reference and realleges ¶¶1-103 contained above, as though fully set forth herein.

## SCIENTER ALLEGATIONS

125. As alleged herein, Palantir and the Individual Defendants acted with scienter in that: (i) they knew or recklessly disregarded that the public documents and statements identified in ¶¶36-66, 71-77, 82-86, 91-97, *supra*, issued or disseminated in the name of the Company, were materially false and misleading; (ii) they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) they participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Furthermore, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Palantir, their control over and/or receipt and/or modification of Palantir's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Palantir, participated in the fraudulent scheme alleged herein. As defendants have readily admitted, the nature of Palantir's business, including the use of large contracts with protracted duration, provided them with substantial visibility into Palantir's ongoing and future revenue, client base, and operational and financial results. In addition, Palantir has stated that the Company works closely with its clients to design software systems that best meet their needs and to integrate their various data systems with the Company's software and products. The unique nature of Palantir's products and services and the substantial investments Palantir made through its SPAC Investment Strategy, which necessitated significant due diligence, provided Palantir and the

Individual Defendants with knowledge about the viability of the relevant companies.  Indeed, the Individual Defendants held themselves out as persons knowledgeable about Palantir's client base, including clients procured through the SPAC Investment Strategy.

126.    The Individual Defendants also had the motive and opportunity to commit fraud, collectively selling **$2.2 billion** worth of Palantir Class A common stock during the Class Period at fraud-inflated prices.  Many of these sales occurred through the Offering, which did not raise any money for Palantir but rather lined the pockets of many of the Individual Defendants.  As a Palantir employee would later admit, Palantir executives had timed the Offering to coincide with a temporary boost in COVID-19 related revenue, stating: "It was supposed to take longer for Palantir to list, but COVID really accelerated the growth of the company, so it got brought forward. . . . ***That growth spurt is what drove [the] decision to list so much sooner***."

### NO SAFE HARBOR

127.    Defendants' "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

128.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Palantir who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying

or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

129.    At all relevant times, the market for Palantir Class A common stock was an efficient market for the following reasons, among others:

(a)    Palantir Class A common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's Form 10-K for the fiscal year ended December 31, 2021, Palantir had more than 1.9 billion shares of Class A common stock outstanding as of February 17, 2022;

(c)    as a regulated issuer, Palantir filed periodic public reports with the SEC;

(d)    Palantir regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    unexpected material news about Palantir was rapidly reflected in and incorporated into prices for Palantir shares during the Class Period.

130.    As a result of the foregoing, the market for Palantir Class A common stock promptly digested current information regarding Palantir from publicly available sources and

reflected such information in the price of Palantir Class A common stock.  Under these

circumstances, all purchasers of Palantir Class A common stock during the Class Period suffered

similar injury through their purchases of Palantir Class A common stock at artificially inflated

prices, and a presumption of reliance applies.

131.    A presumption of reliance is also appropriate in this action under the Supreme

Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's

claims are based, in significant part, on defendants' material omissions.  Because this action

involves defendants' failure to disclose material adverse information regarding Palantir's business,

operations, and risks, positive proof of reliance is not a prerequisite to recovery.  All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions.  Given the importance of defendants'

material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

132.    During the Class Period, as detailed herein, defendants made false and misleading

statements and engaged in a scheme to deceive the market and a course of conduct that artificially

inflated the price of Palantir Class A common stock and operated as a fraud or deceit on Class

Period purchasers of Palantir Class A common stock by misrepresenting the value of the

Company's business and prospects by overstating its earnings and concealing the significant

defects in its internal controls.  As defendants' misrepresentations and fraudulent conduct became

apparent to the market, the price of the Company's stock fell precipitously as the prior artificial

inflation came out of the stock's price.  As a result of their purchases of Palantir Class A common

stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT IV

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

133.    Plaintiff incorporates by reference and realleges ¶¶1-103, 125-132 contained above, as though fully set forth herein.

134.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Palantir Class A common stock during the Class Period.

136.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Palantir Class A common stock.  Plaintiff and the Class would not have purchased Palantir Class A common stock at the prices they paid, or at

all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT V

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

137.    Plaintiff incorporates by reference and realleges ¶¶1-103, 125-136 contained above, as though fully set forth herein.

138.    The Individual Defendants each were controlling persons of Palantir by virtue of their positions as directors and/or senior officers of Palantir and/or as major stockholders of the Company.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major stockholders of Palantir and had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  In addition, defendants Karp, Cohen, and Thiel maintained voting control over the Company as a result of their ownership of Palantir Class A, B, and F shares.  Palantir controlled the Individual Defendants and all of its employees.  Defendants had the power to influence or control the primary violator upon which their control person liability is based and, as detailed herein, actively used this influence or control so as to be a culpable participant in the primary violation.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of

Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such equitable, injunctive, or other relief as deemed appropriate by the

Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 4, 2022                    JOHNSON FISTEL, LLP
                                            JEFFREY A. BERENS


                                            s/ Jeffrey A. Berens
                                   _____
                                            JEFFREY A. BERENS
                                   2373 Central Park Blvd., Suite 100
                                   Denver, CO  80238
                                   Telephone:  303/861-1764
                                   303/861-1764 (fax)
                                   jeffb@johnsonfistel.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Attorneys for Plaintiff